FILED
U.S. DISTRICT COURT
DISTRICT OF MARYLAND

2001 AUG 13  A 10: 49

CLERK'S OFFICE
AT BALTIMORE

BY _____ DEPUTY

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

NEUROTRON, INC.                          :
                                         :
v.                                       : Civil Action WMN-00-514
                                         :
AMERICAN ASSOCIATION OF                  :
      ELECTRODIAGNOSTIC                  :
      MEDICINE                           :

**MEMORANDUM**

Defendant American Association of Electrodiagnostic Medicine

("AAEM") brings a motion for Summary Judgment (Paper No. 44)

against Plaintiff Neurotron, Inc.  The motion has been fully

briefed and is ripe for decision.  Upon a review of the pleadings

and the applicable case law, the Court determines that no hearing

is necessary (Local Rule 105.6) and that Defendant's motion will

be granted.

**I. BACKGROUND**

Defendant AAEM is a Minnesota association of medical

professionals, primarily neurologists, physical medicine and

rehabilitation specialists.  Compl. at ¶¶ 2 & 37.  AAEM publishes

an official journal, <u>Muscle & Nerve</u>, and maintains an Internet

website.  <u>Id</u>. at ¶¶ 44 & 54.  Plaintiff Neurotron is a Maryland

manufacturer and distributor of electrodiagnostic medical

devices, specifically the Neurometer® CPT ("N-CPT").  <u>Id</u>. at ¶¶ 1

& 6-9.  The N-CPT is a diagnostic tool that allows various

medical professionals to test and diagnose neurological disorders

and impairments.  <u>Id</u>. at ¶¶ 9, 24 & 34.

1



In 1989, Neurotron's Dr. Jefferson Katims[1] asked AAEM to conduct a Technology Review of the N-CPT as he felt there was a sufficient number of favorable articles published at that point to merit such a review.  AAEM declined Dr. Katims' request. Three years later, in 1992, AAEM changed its position and decided that a review of the N-CPT was warranted.  The review was conducted by the Equipment and Computer Committee headed by Dr. George Baquis.[2]  In conducting the review, Dr. Basquis identified over 200 sources of information on the N-CPT, including sources identified by Neurotron as favorable to the product.  Dr. Basquis created a criteria for analyzing the scholarly merit of the sources which resulted in a final pool of 44 articles.

In April 1999, Muscle & Nerve published the article authored by the AAEM Equipment and Computer Committee entitled "Technology Review: The Neurometer® Current Perception Threshold (CPT)." Compl. at ¶ 44.  The review concluded that "the information in these publications is insufficient to make conclusions about the usefulness of this form of sensory testing at the present time." Opp. Exh. 1.  The article was revised and republished in September 1999 under the same title and was also placed on AAEM's

_____

[1]Dr. Katims is the inventor of the Neurometer, a principal of Neurotron and a member of AAEM.

[2]The parties disagree as to whether the article was authored and/or reviewed by the entire committee or by Dr. Baquis exclusively.  As this issue has no bearing on the disposition of this case, it need not be addressed.

website.  Compl. at ¶ 54.

Following publication of the original article, Dr. Katims forwarded a lengthy response to AAEM, demanding that they print his response and retract the article.  Compl. at ¶ 50.  Dr. Katims was notified that the article would not be retracted, his response would not be published in Muscle & Nerve due to its length, and that if he wanted to proffer a response, it must conform to the 500 word limit for letters to the editor.  Dr. Katims tendered no response.

Plaintiff claims that as a result of the article, insurers denied reimbursement claims for N-CPT testing.  Compl. at ¶ 42. Plaintiff brought suit against AAEM on February 24, 2000 alleging injurious falsehood, false light commercial disparagement, civil conspiracy, violation of the Lanham Act 15 U.S.C. § 1125 (a)(1)(B), and tortious interference.

## II. PROCEDURAL HISTORY

On February 24, 2000, Plaintiff filed a motion in this Court seeking a temporary restraining order.  This motion was denied on February 25, 2000, by Chief Judge Motz.[3]  Plaintiff then filed a motion for preliminary injunction, which, after a full hearing, the undersigned denied on June 15, 2000.  Paper No. 31.

_____

[3]Chief Judge Motz did, however, require that AAEM post their standard disclaimer on the website stating that the article was not to be used as the basis for reimbursement decisions by insurers.  This disclaimer is identical to the one appearing in the printed version of the article. Paper No. 5; Opp. at 19.

3

Defendant now brings a motion for summary judgment under Federal
Rules of Civil Procedure 56 (c).

## III. **LEGAL STANDARD**

Summary judgment is appropriate under Rule 56 (c) where
"there is no genuine issue as to any material fact and ... the
moving party is entitled to summary judgment as a matter of law."
Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A
dispute is genuine "if the evidence is such that a reasonable
jury could return a verdict for the nonmoving party," and a fact
is material if, when applied to the substantive law, it affects
the outcome of the litigation.  Id.

A party seeking summary judgment bears the initial
responsibility of informing the court of the basis of its motion
and identifying the portions of the opposing party's case which
it believes demonstrate the absence of a genuine issue of
material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323
(1986).  The non-moving party is entitled to have "all reasonable
inferences ... drawn in its respective favor."  Felty v. Graves-
Humphreys Co., 818 F.2d 1126, 1129 (4th Cir. 1987).

If the movant can demonstrate that there indeed is no
genuine issue of material fact and summary judgment should be
entered as a matter of law, the burden shifts to the non-moving
party to produce sufficient evidence that a triable issue of fact
exists.  Celotex, 477 U.S. at 324.  The non-moving party must

4

proffer such evidence through the use of depositions, affidavits or other documentation. Id. These evidentiary materials must show facts from which the finder of fact could reasonably find for the non-moving party. Anderson, 477 U.S. at 252. Unsupported speculation is insufficient to defeat a motion for summary judgment. Felty, 818 F.2d at 1128 (citing Ash v. United Parcel Serv., Inc., 800 F.2d 409, 411-412 (4th Cir. 1986)). Moreover, a mere "scintilla of evidence" is not enough to defeat a motion for summary judgment.

At the summary judgment phase, it is not appropriate for the court to make credibility determinations, weigh the evidence, or draw inferences from the facts which are adverse to the non-moving party; these are jury functions. Id.

## IV. DISCUSSION

### A. THE LANHAM ACT

Plaintiff claims that Defendant violated the Lanham Act ("Act") by publishing false and disparaging commercial speech in competition with the N-CPT to third parties. Compl. at ¶¶ 90-105. Defendant counters that the Lanham Act does not apply in this case because: 1) the Technology Review is not commercial speech; 2) AAEM is not in competition with Neurotron; 3) the article does not promote AAEM products that compete with Neurotron; and, 4) the Technology Review is the kind of speech that Congress excluded from the Act.

5

The Lanham Act was enacted in 1946 as a regulation on trademarks.  In 1988 it was amended to include new language regulating false advertising.  The relevant section of the Act is § 1125 (a)(1)(B), which states:

> (a) Civil Action
>
> (1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any work, term, name, symbol, or device, or any combination thereof, or any false designation or origin, false or misleading description of fact, or false or misleading representation of fact which -
>
> . . .
>
> (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another persons goods, services, or commercial activities,
>
> shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C.A. § 1125 (a)(1)(B).  Since its inception, the Act has caused confusion leading to inconsistent rulings from the district courts.  See Jean Wegman Burns, Confused Jurisprudence: False Advertising Under the Lanham Act, 79 B.U.L. Rev. 807 (1999).  There are, however, a small number of judicial opinions that attempt to provide clarity.

The seminal case on the application of the Lanham Act is Gordon & Breach Science Publishers, S.A. v. American Institute of Physics, 859 F.Supp. 1521 (S.D.N.Y. 1994).  There, Judge Sand

6

announced,

> [t]he principles from the cases and
> legislative history may be summed up as
> follows: In order for representations to
> constitute 'commercial advertising or
> promotion' under Section 43 (a)(1)(B), they
> must be: (1) commercial speech; (2) by a
> defendant who is in commercial competition
> with plaintiff; (3) for the purpose of
> influencing consumers to buy defendant's
> goods or services ... [and] the
> representations (4) must be disseminated
> sufficiently to the relevant purchasing
> public to constitute 'advertising' or
> 'promotion' within that industry.

Id. at 1536. Although this four part test has not been expressly

adopted by the Fourth Circuit, it has been relied upon by courts

within this circuit. See Huntingdon Life Sciences, Inc., v.

Rokke, 978 F.Supp. 662, n. 2 (E.D. Va. 1997).

The threshold issue for a Lanham Act violation is that the

complaining party must establish that the statements at issue

constitute commercial speech. Id. at 666. This is true whether

or not the speech is in fact false. Speech that is false, but

non-commercial, is nevertheless outside the reach of the Act.

See Gordon & Breach, 859 F.Supp. at 1536.

The Supreme Court has defined commercial speech as speech

proposing no more than a commercial transaction. United States

v. Edge Broad. Co., 509 U.S. 418, 426 (1993). Alternatively,

commercial speech can be more broadly defined as an "'expression

related solely to the economic interests of the speaker and its

audience.'" City of Cincinnati v. Discovery Network, Inc., 507

7

U.S. 410, 422 (1993) (quoting Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n of New York, 447 U.S. 557, 561 (1980)).   The article at issue does not fall within either definition.

This Court previously expressed the opinion that "it is unlikely that Plaintiff can establish that the Defendant's article is commercial speech."   Prelim. Inj. Mem. at 9.   Since the preliminary injunction hearing, Plaintiff has come forth with no evidence to suggest that the Court should now change its position.

Plaintiff contends that AAEM had a finanancial motive for publishing such a disparaging article because the N-CPT can be used by medical professionals other than those who are AAEM members.   Yet, nowhere in the article do the authors advocate for a commercial transaction.   It is neither suggested that the reader buy any product or service, nor that they refrain from buying any product or service.   AAEM does not say that the product is bad, that doctors and patients should only seek out Neurologists or physical medicine specialists for testing, or that the N-CPT not be used at all.   It merely states that "the reviewers concluded that information in these publications is insufficient to make conclusions about the usefulness of this form of sensory testing at the present time."   Mot. Exh. 4(A).

Moreover, it is difficult to see how the article could meet the broader standard, i.e., related  "solely to the economic

8

interests of the speaker and its audience." City of Cincinnati, 507 U.S. at 422 (emphasis added). Muscle & Nerve is published, like many trade journals, for the edification of the association's members. While Plaintiff is correct that the article is not removed from commercial speech restrictions simply because it is educational, it does not follow that the article can not be protected speech if the content is something other than purely educational. In Riley v. National Federation of the Blind of North Carolina, the Court found that when commercial and non-commercial speech are inextricably linked, the entire speech loses its commercial character. 487 U.S. 781, 796 (1988). Therefore, even if some language in the article is commercial in nature, it is not necessarily commercial speech.

The possible combination of commercial and non-commercial speech under the broad City of Cincinnati standard necessitates further inquiry into the purpose of the speech. There is no bright line commercial/non-commercial test in situations such as this. Gordon & Breach, 859 F.Supp. at 1540 n. 7 and accompanying text; see also City of Cincinnati, 507 U.S. at 419. Instead, the court may take several factors into consideration. These factors are: 1) whether the entity has a purpose "beyond the solely commercial;" 2) even if the speech is commercial, whether it is advertising constitutionally protected material; 3) whether the advertising at issue is the main purpose of the article; 4)

9

whether there is a connection between the author and the defendant and to what extent; and, 5) whether finding the defendant liable will likely keep these ideas out of the marketplace altogether. Gordon & Breach, 859 F.Supp. at 1540-41.

The Technology Review is published by AAEM, a non-profit organization, whose purpose is not only to lobby and advocate for its members, but also to provide educational services such as informing members of current trends in the industry through publications such as Muscle & Nerve, or by conducting educational seminars. None of these activities are commercial in nature. Arguably, the only thing promoted by the article is further study and publication of additional articles so that some conclusion can be drawn about the effectiveness of the N-CPT.

Plaintiff claims that Dr. Baquis' connection to Defendant as an ex-board member provides him with a commercial motivation to dissuade the use of the N-CPT. But, such a connection, by itself, is insufficient to warrant a finding that, in this context, the speech was commercial. See Gordon & Breach, 859 F.Supp. at 1541 (stating that an officer of the association does not have a sufficient connection to "convert fully protected commentary into less-protected commercial speech.").

Finally, chilling the speech of AAEM in this instance would likely prevent all debate about such subjects from entering into the marketplace. AAEM is the leading association for this

10

profession and muting their voice on important issues such as the
effectiveness of treatments is too great a cost to support
Plaintiff's contentions.  Nowhere has it been shown that the
article was commercial, let alone that the primary purpose of
publication was related "solely to the economic interests of the
speaker and its audience."  City of Cincinnati, 507 U.S. at 422
(emphasis added).  Nevertheless, even if there is some commercial
aspect of the article, it would not be considered commercial
speech under Gordon & Breach because of its public significance
and status as an academic piece published by a non-profit
organization.  See id. at 1541.  If Plaintiff were to prevail on
this issue, any trade journal that gave less than a favorable
report about a product would be open to suit.

## B.  INJURIOUS FALSEHOOD

Although the speech at issue here is not considered
commercial speech, Defendant may still be liable to Plaintiff if
the speech was an injurious falsehood.

> Injurious falsehood or disparagement [is
> defined as] . . . the publication of matter
> derogatory to the plaintiff's title to his
> property, or its quality, or to his business
> in general, or even to some element of his
> personal affairs, of a kind calculated to
> prevent others from dealing with him, or
> otherwise to interfere with his relations
> with others to his disadvantage.

Nat'l. Bd. for Certification in Occupational Therapy, Inc. v.
American Occupational Therapy Ass'n., 24 F.Supp.2d 494, 511 n. 27

11

(D. Md. 1998) (quoting <u>Horning v. Hardy</u>, 36 Md. App. 419, 426-27 (1977)). Furthermore, "[t]o maintain a claim for injurious falsehood, [Plaintiff] must establish that [Defendant], <u>with malice</u>, published a known falsity to a third party, that caused special damages." <u>Id</u>. (emphasis added).

Defendant argues that Plaintiff's injurious falsehood claims must fail because it cannot meet the actual malice standard laid out in <u>New York Times v. Sullivan</u>, 376 U.S. 254 (1964).[4]  That standard bars liability for speech unless the plaintiff can prove that the speech was made "with knowledge that it was false or with reckless disregard of whether it was false or not." <u>Id</u>. at 280.  For the purposes of summary judgment, "where the factual dispute concerns actual malice ... the appropriate summary judgment question will be whether the evidence in the record could support a reasonable jury finding either that the plaintiff has shown actual malice by clear and convincing evidence or that the plaintiff has not." <u>Anderson</u>, 477 U.S. at 255-56.

Here, Plaintiff has not shown any evidence, let alone clear and convincing evidence, tending to prove actual malice.  For example, Plaintiff's characterization of Defendant's "<u>Strategic</u>

---

[4]This standard is also applicable to injurious falsehood claims.  <u>See Horning v. Hardy</u>, 36 Md. App. 419, 426 (1977) (stating that "in order to recover the plaintiff must show malice")(citing <u>Beane v. McMullen</u>, 265 Md. 585 (1972)); <u>see generally Bose Corp. v. Consumers Union of U.S., Inc.</u>, 466 U.S. 485 (1984) (applying the actual malice standard to an article that allegedly disparaged plaintiff's product).

12

Plan" as indicative of Defendant's economic motivation to
disparage the N-CPT misrepresents that plan. The plan is
published on Defendant's website and identifies the need for the
association to adapt to modern standards in the field. The goal
of the plan is to revise the purpose of the association to
conform to these new standards. While the plan does contain the
language "competing emerging technologies," it does so only by
quoting a letter sent to the association voicing this concern.
Competing technologies are not a stated concern of Defendant. In
fact, the plan proposes "that the scope of the association be
broadened to include many types of diagnostic tools," and that
AAEM "should broaden our potential member base to include
physicians who may not practice electrodiagnostic medicine."
Opp. Exh. A. This "Strategic Plan" does not demonstrate, as
Plaintiff asserts, Defendant's economic motivation to disparage
the N-CPT. Instead, it more clearly supports AAEM's efforts to
incorporate new technologies, such as the N-CPT, and non-
specialized physicians into its ranks.

Moreover, the Technology Review cannot be seen as an attempt
to dissuade insurers from medical reimbursement for the N-CPT.
The review contains a disclaimer that specifically states "[t]his
review was not written with the intent that it be used as a basis
for reimbursement decisions." Mo. Exh. 1. Such a disclaimer
clearly places insurers on notice that decisions based on the

review would be inappropriate.

Plaintiff's other evidence on this issue is similarly deficient to show that AAEM clearly and convincingly acted with actual malice when writing and publishing the review.  Because Plaintiff cannot prove actual malice, its injurious falsehood claim must fail.[5]

**CONCLUSION**

For the above stated reasons, Defendant's motion for summary judgment will be granted.  A separate Order will issue.

William M. Nickerson
United States District Judge

Dated: August *13*, 2001

---

[5]Plaintiff's other claims need not be addressed as Plaintiff admits that, if Defendant prevails on the Lanham Act and injurious falsehood claims, the other claims will fall as well. See Pl.'s Opp. Def.'s Prelim. Obj. at 12.

14